**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| HEALTHPRO PHARMACY & WELLNESS CENTER, | **Case No.** 3:24-cv-1878 |
| Plaintiff, | |
| v. | **VERIFIED COMPLAINT** |
| OPTUM RX, | |
| Defendant. | |

Plaintiff HealthPro Pharmacy & Wellness Center ("Pharmacy" or "HealthPro"), for its Verified Complaint, hereby alleges, under penalty of perjury, as follows:

## I.   OVERVIEW

1. Despite the hot glare of ongoing Federal Trade Commission and Congressional investigations, public warnings by the Centers for Medicaid & Medicare Services, and state legislative reforms sweeping the nation, including multiple statutes enacted by Texas under Governor Abbott, Defendant Optum Rx ("Optum"), a pharmacy benefit manager ("PBM") owned by industry behemoth United Health Group, Inc., apparently believes that it can continue operating with impunity to eliminate smaller, independent pharmacies such as HealthPro and steer their patients and prescriptions to Optum's own, corporate-affiliated pharmacy.

2. Optum is particularly motivated to target independent pharmacies like HealthPro because another corporate affiliate within the United Health enterprise, United Healthcare, is the largest Medicare Advantage plan sponsor, and its Medicare Advantage AARP ("MA-AARP") plan is the most popular Medicare Advantage plan in the marketplace, enrolling millions of beneficiaries each year. The viability (and profitability) of these Medicare Advantage plans, however, is under serious threat given soaring "medical loss ratios" as insureds return to doctors'

offices and resume elective procedures following the pandemic.

3.      Hence, Optum has embarked on a scheme to return millions of dollars to the bottom line of its corporate parent through sham audits, false claim recoupments, retaliatory terminations, and patient/prescription steering for beneficiaries of its MA-AARP plan. HealthPro is not the only victim of Optum's unlawful conduct, but Optum requires all pharmacies enrolled in its network to agree to a contract of adhesion that contains a class-action waiver and mandatory, confidential arbitration of disputes arising from the parties' obligations thereunder.

4.      Accordingly, HealthPro files this Verified Complaint to preserve the status quo because it was provided with merely 10-days notice, on or about July 15, 2024, that it would be terminated from Optum's provider network on July 25, 2024. In fact, Optum based its termination of the Pharmacy on an audit of <u>three</u> claims, totaling $3,505, i.e., <u>claims that represented 0.2% of Plaintiff's business with Optum in 2023.</u>

5.      Because approximately 40% of the Pharmacy's business is comprised of beneficiaries of health insurance plans administered by Optum; because Optum has already transferred numerous patients and prescriptions from the Pharmacy to its own, internal pharmacy; and because Optum is withholding, absent any legitimate basis whatsoever, hundreds of thousands of dollars in reimbursement due and owing the Pharmacy; HealthPro will suffer irreparable harm absent an injunction.

6.      Moreover, Optum's conduct is plainly illegal under Texas and federal law. Hence, the Pharmacy is substantially likely to succeed on its claims provided it is not eliminated as a going concern by Optum's very conduct.

## II.    PARTIES

7.      Plaintiff HealthPro Pharmacy & Wellness Center is an independent pharmacy that

has a principal place of business and serves the community in Rowlett, Texas.

8.     Defendant Optum Rx, Inc. is a California corporation with its principal place of business in Irvine, California. Optum is licensed and engaged in the business of insurance in the state of Texas. Optum may be served through its registered agent, CT Corporation System, at 1999 Bryan St., Suite 900, Dallas, Texas 75201.

## III.    JURISDICTION & VENUE

9.     The foregoing allegations are incorporated herein by reference.

10.     Venue is proper in the Northern District of Texas pursuant to 28 U.S.C. § 1391(b)(2) because all or a substantial part of the events or omissions giving rise to the claims occurred in the Northern District of Texas.

11.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a) because (1) defendant is not a citizen of any state of which plaintiff is also a citizen; and (2) the amount in controversy exceeds $75,000, exclusive of interest and costs.

12.     Jurisdiction is also proper under 28 U.S.C. § 1331 because Plaintiff asserts claims arising under federal law, including Medicare's Any Willing Provider Law. See 42 U.S.C. § 1395w-104(b).

13.     This Court has jurisdiction over any claims arising under state law pursuant to the Court's supplemental jurisdiction under 28 U.S.C. § 1367.

## IV.    FACTUAL ALLEGATIONS

14.     In or about January 2020, Dr. Omolara Sodunola, a pharmacist with over 20 years of experience, founded HealthPro Pharmacy.

15.     In or about July 2020, Optum entered into a Pharmacy Network Agreement with HealthPro. The terms of the parties' agreement incorporate Optum's Provider Manual, which

Optum updates annually, and applicable federal and state law.

16.     In a nutshell, the parties' agreement provides terms and conditions for the processing and reimbursement of prescription drug claims submitted by HealthPro for medicines dispensed to beneficiaries of the various health insurance plans that Optum administers.

17.     Optum, and two other PBMs, CVS Caremark and Express Scripts, together control 80% of the market for prescription claim processing and administration. Accordingly, absent admission to one of the "Big Three's" provider networks, a pharmacy cannot survive.

18.     Specifically, a pharmacy must service enough patients to provide it with the volume necessary to purchase drugs at a price that will enable the pharmacy to earn a profit on the dispensing of those medications. Hence, the network termination has devastating consequences for a pharmacy, not solely with respect to a pharmacy's inability to service beneficiaries of insurance plans within the network, but also with respect to the collateral loss of scale and purchasing power across the pharmacy's operations.

19.     On or about August 9, 2023, Optum completed an audit of HealthPro that alleged Plaintiff had received $3,505.83 in overpayments from Defendant—i.e., 0.2% of Plaintiff's business with Optum in 2023.

20.     Nonetheless, on or about November 8, 2023, Optum served the Pharmacy with notice of termination based on its August 9, 2023, audit findings

21.     Approximately 40% of the Pharmacy's business is comprised of beneficiaries for Optum-administered health plans. In the event the Pharmacy is terminated from Optum's provider network, it will be forced into bankruptcy.

22.     Such a result will further aggravate the expansion of "pharmacy deserts" that are spreading across the country and Texas, including underserved minority communities in Dallas.

23.     For these reasons, Texas has enacted broad-based reforms directed at PBM abuses, including laws that prohibit: (a) the failure to promptly pay reimbursement due to participating providers in a timely manner; (b) extensive "fair audit" requirements; (c) the "steering" of patients to affiliated providers; and (d) retaliatory conduct of any type.

24.     Texas is not alone in acting to stop PBMs like Optum from engaging in the type of conduct alleged here. For example, earlier this month, on July 9, 2024, the Federal Trade Commission published a report finding that PBMs such as Optum "appear to have the ability and incentive to prefer their own affiliated businesses, creating conflicts of interest that can disadvantage unaffiliated pharmacies and increase prescription drug costs. PBMs may be steering patients to their affiliated pharmacies and away from smaller, independent pharmacies."[1]

25.     Similarly, late last year, on December 14, 2023, the Centers for Medicaid and Medicare Services issued a letter warning PBMs that the agency is closely monitoring CMS "network adequacy standards," because "the increasing level of vertical integration that is occurring among plans, PBMs, and their own pharmacies has the potential to result in anticompetitive behavior and place independent pharmacies at a disadvantage."[2] CMS further noted that such PBM practices threaten the sustainability of small and independent pharmacies, impede access to care, and put increased burden on health care providers.

26.     It is against this unmistakable backdrop that HealthPro's allegations should be evaluated and Optum forced to comply with the law.

---

[1] Federal Trade Commission, *FTC Releases Interim Staff Report on Prescription Drug Middlemen,* FED. TRADE COMM'N (July 9, 2024), https://www.ftc.gov/news-events/news/press-releases/2024/07/ftc-releases-interim-staff-report-prescription-drug-middlemen (last accessed on July 20, 2024).
[2] See Centers for Medicare & Medicaid Services, *CMS Letter to Plans and Pharmacy Benefit Managers*, CMS (Dec. 14, 2023), https://www.cms.gov/newsroom/fact-sheets/cms-letter-plans-and-pharmacy-benefit-managers ((last accessed on July 20, 2024).

**Optum's Wrongful Termination of HealthPro**

27.      On or about November 8, 2023, Optum provided notice of network termination to HealthPro.

28.      The basis of Optum's termination was a sum total of three (3) allegedly discrepant claims. These claims represented approximately **0.2%** of Plaintiff's business with Optum in 2023.

29.      Optum claimed that one patient had not received his/her medicine from HealthPro.

30.      Optum claimed that two patients had received their medicines from HealthPro, but had not authorized HealthPro to dispense those prescriptions.

31.      Separately, Optum claimed that Dr. Sodunola was "associated" with a different pharmacy, Scepter Pharmacy, that had been terminated by Optum.

32.      The Pharmacy challenged Optum's termination via letter, dated December 8, 2023, in which it demonstrated that none of Optum's alleged bases for termination had merit.

33.      HealthPro submitted substantial documentation, including tracking confirmations, signature logs, patient attestations, and recordings, in support of its appeal.

34.      Defendant subsequently scheduled a hearing on HealthPro's appeal, to be held March 21, 2024.

**Optum's Retaliatory Second Audit**

35.      During the Pharmacy's appeal, Optum conducted a second "desktop" audit. Optum conducted its purported audit with no notice to HealthPro, contrary to the notice requirements contained in the parties' agreement.

36.     Optum did not notify the Pharmacy of its audit findings until December 11, 2023, three days after HealthPro filed its appeal.

37.     Compared to Optum's first audit, the timeframe for its second audit was significantly expanded, from March 15, 2023 through October 8, 2023.

38.     In its preliminary findings, Optum alleged that the Pharmacy had dispensed $287,017.93 in medications that the Pharmacy never purchased.

39.     It was not until months later, on February 23, 2024, that Optum admitted its "inventory shortage" allegation was completely unsupported, and resulted in Final Finding of $0.

40.     Optum also claimed that the Pharmacy had been "overpaid" by $80,374.90, based on various alleged discrepancies, including additional member denials and mail-order deliveries.

41.     In its final audit findings, dated February 23, 2024, Optum reduced the alleged discrepant claim amount to $61,676.10--representing merely **3.8%** of Plaintiff's business with Optum in 2023--all of which, in any event, is contravened by the facts and applicable law, including Texas PBM reform laws that prohibit PBMs from barring mail-order delivery.

**Optum's Second Notice of Termination**

42.     Seven days before the March 21, 2024, hearing on HealthPro's appeal from Optum's original termination notice, on or about March 13, 2024, Optum provided the Pharmacy was a second notice of termination that added new reasons for the termination, labeled "additional findings."

43.     On March 19, 2023, HealthPro submitted additional documentation and evidence that demonstrated Optum's findings were without merit.

44.     The parties attended a March 21, 2024, hearing, in which HealthPro further demonstrated that Optum's findings were baseless.

45.     Nonetheless, on March 26, 2024, Optum rejected the Pharmacy's appeal, purportedly because "Pharmacy was unable to provide additional information or clarifying information to overturn the original basis of termination."

46.     Although Optum's notice stated that the Pharmacy had not rebutted "the original basis of termination," Optum based its decision to terminate on reasons cited for the first time in its second notice of termination, dated March 13, 2024.

47.     Optum stated that HealthPro would be terminated, effective May 20, 2024.

48.     On April 29, 2024, HealthPro served Optum with a dispute notice and requested that Optum provide a written explanation why the overwhelming documentary evidence provided by the Pharmacy had been rejected wholesale.

49.     Defendant subsequently scheduled a dispute resolution hearing, to be held July 11, 2024.

50.     At the July 11, 2024, hearing, HealthPro took the position that Optum's termination was baseless, but nonetheless attempted to reach agreement on terms that would permit it to remain in-network.

51.     Just two business days later, on July 15, 2024, Optum provided notice to the Pharmacy that it would be terminated, effective July 25, 2024.

52.     Once again, OptumRx failed to provide any explanation of why termination was appropriate given the weight of the evidence, or why a 10-day termination period was warranted.

**<u>Optum's Ongoing Violations of Law</u>**

53.     Throughout Optum's audits and the foregoing issues, the Pharmacy has continued to process claims for beneficiaries of Optum's clients.

54.     Despite the Pharmacy's uninterrupted service, Optum has unilaterally withheld over $313,501.61 in reimbursement due and owing the Pharmacy.

55.     In addition, Optum has contacted and continues to contact the Pharmacy's patients in an effort to "steer" those patients and their prescriptions to Optum's in-house, mail-order pharmacy.

56.     In its audits, all of Optum's alleged patient denials were from beneficiaries of its MA-AARP plan, sponsored by United Healthcare.

57.     Likewise, Optum transferred multiple prescriptions and patients from HealthPro to its in-house pharmacy, all of whom were beneficiaries of its MA-AARP plan, sponsored by United Healthcare.

58.     Optum used and is using the Pharmacy's confidential and trade secret information to solicit the Pharmacy's patients.

59.     Optum has contacted and is contacting other patients of the Pharmacy, one of whom told the Pharmacy about Optum's solicitation.

60.     Specifically, Optum sent the Pharmacy a request to transfer the patient's prescription, leading the Pharmacy to contact the patient to confirm Optum's request.

61.     The patient, another beneficiary of United Healthcare's MA-AARP plan, told the Pharmacy that Optum had contacted her and solicited the prescription to be transferred. Subsequently, the patient canceled the prescription transfer and remained with HealthPro.

**Network Termination Consequences**

62.     Based on the loss of its ability to service patients who make up approximately 40% of the Pharmacy's revenue, Optum's termination will eliminate the Pharmacy's ability to continue as a going concern.

63.     In addition, Optum's termination will bankrupt the Pharmacy because the loss of patients will deprive it of the volume and scale necessary to purchase and dispense medications profitably.

64.     Further, when a pharmacy is terminated from a PBM network, all other PBMs require that the terminated pharmacy provide notice of such to the PBM.

65.     As a result, Optum's termination will have a "cascade-effect" that will result in HealthPro's termination from all other provider networks.

66.     Optum's termination will harm the Pharmacy's established goodwill within the community of patients it serves. HealthPro has served Texas patients since 2020, and has spent considerable time and resources cultivating its upstanding reputation among both providers and patients.

67.     Optum's termination will also advance its scheme, and harm the Pharmacy, by boosting its market share and competitive position against rival pharmacies.

68.     Consequently, Optum's termination will cause HealthPro irreparable harm.

## V.    CAUSES OF ACTION

### Count 1 – Injunctive Relief

69.     The foregoing allegations are incorporated herein by reference.

70.     There is a substantial likelihood that Plaintiff will prevail on the merits of its claims against Defendant, as further outlined in its request for immediate injunctive relief and supporting memorandum of law filed herewith and accompanying papers.

71.     Plaintiff will suffer irreparable harm absent an injunction, including bankruptcy; exclusion from other PBM networks; the loss of patients; the loss of its ability to service a significant portion of Texas Medicare patients; the loss of its good will and competitive,

confidential and trade secret information; and the loss of its ability to litigate these issues because Optum has withheld from it significant reimbursement due and owing the Pharmacy.

72.    Optum will suffer no harm in the event injunctive relief is granted—it has permitted the Pharmacy to remain in network and service beneficiaries for more than one year since its first audit.

73.    The public interest will not be disserved by an injunction here because Optum's conduct violates long-standing federal and state law, recently enacted PBM reforms under Governor Abbott targeting the precise conduct alleged here, and will eliminate another independent pharmacy and point-of-care for Texas patients.

74.    A temporary restraining order preserving the status quo is necessary until such time as a hearing can be held on Plaintiff's application because Optum's termination was made on 10-days notice, effective July 25, 2024.

75.    Accordingly, a temporary restraining order and injunctive relief should issue barring Defendant from:

(a) terminating Plaintiff from its provider networks pending arbitration of the parties' dispute;

(b) transferring Plaintiff's patients to its corporate-affiliated, mail-order Pharmacy, including through the misappropriation of Plaintiff's confidential and trade secret information; and

(c) retaliating against Plaintiff, including by failing to process and/or pay reimbursement due and owing Plaintiff.

## Count 2 – Violation of Texas Insurance Law, Section 843.309

76.    The foregoing allegations are incorporated herein by reference.

77.     Section 843.309 requires "reasonable" advance notice of termination.

78.     Defendant's 10-day notice period is not reasonable because it does not provide sufficient time for patient continuity of care.

79.     Defendant's 10-day notice period was retaliatory and therefore not reasonable.

80.     Defendant's 10-day notice period is effectively "immediate," and therefore not reasonable.

81.     As a direct and proximate result of Defendant's conduct, Plaintiff has been damaged.

## Count 3 – Violation of Federal & State "Prompt Payment" Laws

82.     The foregoing allegations are incorporated herein by reference.

83.     Defendant has failed to remit hundreds of thousands of dollars in reimbursement due and owing Plaintiff for at least 257 days.

84.     Under federal law, Defendant is required to pay "clean claims" within 10 days after the date on which the claim is received. See 42 U.S.C. § 1395w-112(b)(4)(B). A claim is deemed to be a clean claim if notice to the provider is not given, with respect to electronically submitted claims, within 10 days after the date on which the claim is received. Id. § 1395w-112(b)(4)(D).

85.     Under state law, Defendant is required to "pay the total amount of [a prescription] claim through electronic funds transfer not later than the 18th day after the date on which the claim was affirmatively adjudicated," or to make a determination within 30 days whether the claim is, in fact, payable and provide written notice of such to the Pharmacy. See Tex. Ins. Code §§ 843.339(a), 843.338.

86.     Defendant is prohibited from recouping any alleged "overpayment" absent a written notice within 180 days and an opportunity to appeal. See Tex. Ins. Code § 843.350.

87.     As a direct and proximate result of Defendant's conduct, Plaintiff has been damaged.

## Count 4 – Violation of State Patient Solicitation Laws

88.     The foregoing allegations are incorporated herein by reference.

89.     Texas law prohibits Defendant from soliciting patients to use Defendant's own mail order pharmacy. See Tex. Ins. Code § 1369.554 ("A health benefit plan issuer or pharmacy benefit manager may not steer or direct a patient to use the issuer's or manager's affiliated provider through any oral or written communication."); id. § 1369.555(c) ("A health benefit plan issuer or pharmacy benefit manager may not solicit a patient or prescriber to transfer a patient prescription to the issuer's or manager's affiliated provider.")

90.     Under the guise of audits, Defendant has been contacting Plaintiff's patients and soliciting them to transfer their prescriptions to Defendant's affiliated mail-order pharmacy.

91.     Defendant has transferred numerous patients and prescriptions to its mail-order pharmacy, including members of United Healthcare's MA-AARP plan.

92.     As a direct and proximate result of Defendant's conduct, Plaintiff has been damaged.

## Count 5 – Violation of Texas Fair Audit Laws

93.     The foregoing allegations are incorporated herein by reference.

94.     Section 843.3385 of the Texas Insurance Code provides: "If a health maintenance organization needs additional information from a treating physician or provider to determine payment, the health maintenance organization, not later than the 30th calendar day after the date

13

the health maintenance organization receives a clean claim, shall request in writing that the physician or provider provide an attachment to the claim that is relevant and necessary for clarification of the claim." Tex. Ins. Code § 843.3385(a).

95.     If a PBM like Defendant needs information from a person other than the participating provider who submitted the claim, it is required to provide notice of such to the provider who submitted the claim. Id. § 843.3385(e).

96.     By contacting Plaintiff's providers secretly, and without notice to the Pharmacy, Defendant violated the law.

97.     In its correspondence with HealthPro, OptumRx has repeatedly admitted to having direct contact with HealthPro's patients on multiple occasions.

98.     As a direct and proximate result of Defendant's conduct, Plaintiff has been damaged.

### **Count 6 – Violation of Federal and State Trade Secret Misappropriation Laws**

99.     The foregoing allegations are incorporated herein by reference.

100.     The federal Defend Trade Secrets Act, 18 U.S.C. § 1836 et seq., provides for injunctive relief and a monetary damages claim by the owner of a trade secret that is misappropriated.

101.     The Texas Uniform Trade Secrets Act prohibits the theft of confidential and trade secret information for competitive advantage. See Texas Civil Practice & Remedies Code, tit. 6, Chapter 134A.

102.     Defendant misappropriated the Pharmacy's confidential and trade secret information, including patient lists, contact information, prescription history, and drug-cost and pricing information.

14

103.     Defendant used the Pharmacy's information to steer Pharmacy patients to Defendant's affiliated pharmacy.

104.     As a direct and proximate result of Defendant's conduct, Plaintiff has been damaged.

## Count 7 – Violation of Federal and State Anti-Retaliation Laws

105.     The foregoing allegations are incorporated herein by reference.

106.     Federal law prohibits a prescription drug plan sponsor or its delegate, such as a PBM like Defendant, from retaliating against a provider like Plaintiff for exercising a right of action under the law, including an appeal. See 42 U.S.C. § 1395w-112(b)(4)(F).

107.     Texas PBM reform laws prohibit Defendant from retaliating against Plaintiff, including by: (1) terminating or refusing to renew a contract with the pharmacist or pharmacy; (2) subjecting the pharmacist or pharmacy to increased audits; or (3) failing to promptly pay pharmacist or pharmacy any money owed by the pharmacy benefit manager to the pharmacist or pharmacy. See Tex. Ins. Code § 1369.559; id. § 843.281(b) (prohibiting appeal-based retaliation).

108.     Defendant retaliated against Plaintiff because Plaintiff pursued an appeal from Defendant's November 8, 2023, termination notice.

109.     Defendant retaliated against Plaintiff by conducting a second audit of Plaintiff.

110.     Defendant retaliated against Plaintiff by failing to promptly pay reimbursements due and owing.

111.     Defendant retaliated against Plaintiff by providing only 10-days notice of termination.

15

112.   As a direct and proximate result of Defendant's conduct, Plaintiff has been damaged.

### Count 8 – Violation of Federal and State "Any Willing Provider" Laws

113.   The foregoing allegations are incorporated herein by reference.

114.   Federal law requires Defendant "to have a standard contract with reasonable and relevant terms and conditions for participation whereby any willing pharmacy may access the standard contract and participate as a network pharmacy." See 42 C.F.R. § 324.505(b)(18).

115.   Article 21.52B of the Texas Insurance Code also prohibits a PBM like Defendant from denying a pharmacy "the right to participate as a contract provider under the policy or plan if the pharmacy or pharmacist agrees to provide pharmaceutical services that meet all terms and requirements and to include the same administrative, financial, and professional conditions that apply to pharmacies and pharmacists who have been designated as providers under a policy or plan." Tex. Ins. Code art. 21.52B.

116.   Defendant violated federal and state law by excluding Plaintiff from its provider networks absent legitimate basis.

117.   As a direct and proximate result of Defendant's conduct, Plaintiff has been damaged.

### Count 9 – Breach of Contract

118.   The foregoing allegations are incorporated herein by reference.

119.   The parties have a valid and enforceable agreement, consisting of network enrollment forms, the terms of Optum's Provider Manual, and network agreement.

120.   HealthPro substantially performed all material obligations.

121.   Defendant breached the parties' agreement by terminating HealthPro based on

16

non-existent audit findings.

122.  Defendant breached the parties' agreement by terminating HealthPro for immaterial contractual violations.

123.  Defendant lacked cause to terminate HealthPro's network participation.

124.  As a direct and proximate result of OptumRx's conduct, HealthPro has suffered actual and consequential damages.

### Count 10 – Breach of the Implied Duties of Good Faith and Fair Dealing

125.  The foregoing allegations are incorporated herein by reference.

126.  The parties have a valid and enforceable agreement, consisting of network enrollment forms, the terms of Optum's Provider Manual, and network agreement.

127.  Defendant breached the implied covenants of good faith and fair dealing in the parties' agreement.

128.  Defendant conducted sham audits of Plaintiff and contacted Plaintiff's patients in an attempt to misappropriate them to its corporate affiliate under the guise of said audits.

129.  Plaintiff was targeted by Defendant for audits because Defendant was seeking to reduce costs incurred by another corporate affiliate, United Healthcare, on care for those beneficiaries.

130.  Defendant retaliated against Plaintiff through increased audits, termination on short notice, and withholding hundreds of thousands of dollars in reimbursement due and owing the Pharmacy.

131.  As a direct and proximate result of Optum's breaches, HealthPro has suffered actual and consequential damages.

## Count 11 – Unjust Enrichment

132.  The foregoing allegations are incorporated herein by reference.

133.  Defendant has enriched itself at Plaintiff's expense in numerous ways. Defendant has refused to remit hundreds of thousands of dollars in reimbursement rightfully due and owing Plaintiff.

134.  Defendant also has misappropriated Plaintiff's confidential and trade secret information and used it to transfer Plaintiff's patients to Defendant's affiliated provider.

135.  Defendant and its corporate affiliate enriched themselves at the expense of Plaintiff's business, reputation, and goodwill.

136.  As a direct and proximate result of Defendant's conduct, Plaintiff has been damaged.

## VI.    ATTORNEYS' FEES

137.  Plaintiff hereby requests an award of its reasonable and necessary attorneys' fees as to all claims to which it is entitled to recover, pursuant to various statutory and contractual rights, including but not limited to Section 843.343 of the Texas Insurance Code, Chapter 38 of the Texas Civil Practice Code, for which this claim has been validly presented, Section 134A.005 of the Texas Civil Practice and Remedies Code, and all other statutes and applicable contracts for which the recovery of attorneys' fees is permitted.

## VII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court award the following relief:

(i)      The injunctive relief requested herein;

(ii)     All actual and consequential damages suffered by Plaintiff as a result of Defendant's unlawful actions;

(iii)    Plaintiff's attorneys' fees, expenses, and court costs;

18

    (iv)     Prejudgment and post-judgment interest as allowed by law; and

    (v)     All other relief, both special and general, at law or in equity, to which Plaintiff may show itself justly entitled.

Dated: July 23, 2024

                        Respectfully submitted,

                        **CUNNINGHAM SWAIM, LLP**

                        */s/ Alex Whitman*
                        Alex J. Whitman
                        State Bar No. 24081210
                        awhitman@cunninghamswaim.com
                        CUNNINGHAM SWAIM, LLP
                        4015 Main Street, Suite 200
                        Dallas, Texas 75226
                        Telephone: (214) 646-1495
                        Facsimile: (214) 613-1163

                        **HEALTH LAW ALLIANCE**

                        */s/ Anthony J. Mahajan*
                        Anthony J. Mahajan (*pro hac vice* forthcoming)
                        Diana Yastrovskaya (*pro hac vice* forthcoming)
                        51 John F. Kennedy Parkway
                        Short Hills, NJ 07078
                        Telephone: (800) 345-4125
                        amahajan@healthlawalliance.com

                        **ATTORNEYS FOR PLAINTIFF**

## VERIFICATION

STATE OF TEXAS         §
                              §

ROCKWALL COUNTY     §

      BEFORE ME, the undersigned authority, on this day personally appeared, Omolara

Sodunola, who, being by me duly sworn, on her oath deposed and said that: (1) she is authorized

to execute this verification on behalf of HealthPro Pharmacy and Wellness Center; (2) she has

read the factual allegations in the above and foregoing Verified Complaint; (3) those facts recited

therein are within her personal knowledge or were made known to her through business records

of HealthPro Pharmacy and Wellness Center; and (4) the statements of facts contained therein are

true and correct to the best of her knowledge.



                                    Omolara Sodunola

      SUBSCRIBED AND SWORN TO BEFORE ME, the undersigned authority, on this 22ⁿᵈ

day of July 2024, to certify which witness my hand and official seal.

                                      Notary Public Signature

AUSTIN VAUGHN KNOFF
Notary ID #134579650
My Commission Expires
September 27, 2027

07-
22-
2024

(PERSONALIZED SEAL)